**In re MERCEDES–BENZ ANTITRUST LITIGATION.**

**No. CIV.A. 99–4311(AMW).**

United States District Court,
D. New Jersey.

Feb. 19, 2003.

Lisa J. Rodriguez, Esq., Rodriguez & Richards, Haddonfield, NJ, Liason Counsel.

Anthony J. Bolognese, Esq., Bolognese & Associates, Philadelphia, PA, Michael D. Hausfeld, Esq., Paul T. Gallagher, Esq., Cohen, Milstein, Hausfeld & Toll, Washington, D.C., Eugene A. Spector, Esq., Jeffrey J. Corrigan, Esq., Spector, Roseman & Kodroff, Philadelphia, PA, Co-lead Counsel for Plaintiffs.

Stephen N. Dermer, Esq., Lowenstein Sandler, Roseland, NJ, Peter A. Efros, Esq., Efros & Woopaty, Red Bank, NJ, Robert J. Kipnees, Esq., Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, Woodbridge, NJ, Andrew P. Napolitano, Esq., Fischbein, Badillo, Wagner, Harding, James I. Serota, Esq., Vinson & Elkins, Michael Shuster, Esq., White & Case, New York City, for Dealer Defendants.

Michael S. Waters, Esq., Stephen F. Payerle, Esq., Carpenter, Bennett & Morrissey, Newark, NJ, Charles A. Newman, Esq., E. Perry Johnson, Esq., Bryan Cave, LLP, St. Louis, MO, Robert J. Dwyer, Esq., Elizabeth A. Bousquette, Esq., Bryan Cave, LLP, New York City, for Defendant Mercedes–Benz USA, Inc.

Ronald B. Weisenberg, Esq., Vedder, Price, Kaufman & Kammholz, Livingston, NJ, John H. Eickemeyer, Esq., Vedder, Price, Kaufman & Kammholz, New York City, for Defendant Sheft, Kahn & Co., LLP.

James A. Moss, Esq., Stacy K. Rosenberg, Esq., Herrick, Feinstein, LLP, New York

City, Newark, NJ, Steven M. Edwards, Esq., Nicholas W.C. Carson, Esq., Hogan & Hartson, New York City, for Mercedes–Benz Manhattan, Inc.

Thomas M. Madden, Esq., Hack, Piro, O'Day, Merklinger, Wallace & McKenna, Florham Park, NJ, for Defendant Beifus Motors.

### OPINION

WOLIN, Senior District Judge.

This matter is opened before the Court upon the motion of plaintiffs for certification of this action as a class action pursuant to Federal Rule of Civil Procedure 23. Defendants have filed a related motion to strike the testimony of plaintiffs' expert Dr. John C. Beyer pursuant to Federal Rule of Evidence 702, as interpreted by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Court has decided these submissions on the written submissions of the parties pursuant to Federal Rule of Civil Procedure 78. For the reasons set forth below, plaintiffs' motion will be granted and this matter will be certified as a class action pursuant to Rule 23(b)(3). Defendants' motion to strike the testimony of Dr. Beyer will be denied, without prejudice.

### DISCUSSION

Familiarity with the basic facts in this case is assumed. They are set forth in this Court's opinion reported at 157 F.Supp.2d 355 (D.N.J.2001). In short, plaintiffs allege that Mercedes–Benz USA, the national distributor of Mercedes–Benz automobiles, each of its local dealers in New York City and the southern New York, western Connecticut and northern New Jersey suburbs, and the accountant Sheft Kahn conspired to fix the prices of new automobiles sold or leased by them to consumers from February 1992 to August 1999. The complaint has survived a motion to dismiss. *See id.* The named plaintiffs now move for an Order certifying this matter as a class action on behalf of all persons similarly situated to them.

Federal Rule of Civil Procedure 23 sets forth a two-part scheme for class certification. The first part, subsection (a), states the threshold requirements for all class actions. The second, subsection (b), sets forth the three varieties of class actions contemplated by the Rule and the special requirements peculiar to each in addition to those of subsection (a). The content of each of the criterion is illuminated by substantial case law.

Rule 23(a) states that a class action may be certified

> only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

These requirements are known familiarly as "numerosity," "commonality," "typicality," and adequacy of representation.

Plaintiffs invoke two of the three alternatives of subsection (b), paragraphs (b)(2) and (b)(3). They argue that certification under Rule 23(b)(2) is appropriate, because "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief necessary with respect to the class as a whole[.]" Plaintiffs also contend that the Court should certify the class under Rule 23(b)(3), finding that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The Rule gives a non-exhaustive list of factors that would weigh in favor of such findings and certification under paragraph (b)(3).

The law places the burden of establishing each of these elements on the party seeking class certification. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). It must be recalled, however, that Rule 23 and

modern class action practice in the federal courts have their roots in equity, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832–33, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), and this Court must exercise its discretion in ruling on a motion to certify. *In re Fine Paper Antitrust Litig.*, 685 F.2d 810, 822 (3d Cir. 1982), *cert. denied sub nom., Alaska v. Boise Cascade*, 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1003 (1983).

The Third Circuit has held that the "interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action." *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 343, 88 L.Ed.2d 290 (1985). The *Eisenberg* court made this statement with reference to securities class actions and expressly linked it to the lack of alternatives to enforcing the securities laws. However, this holding of *Eisenberg* has been relied upon in other areas as well, including antitrust. *E.g., In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 476 (W.D.Pa.1999); *In re Chlorine & Caustic Soda Antitrust Litig.*, 116 F.R.D. 622, 624–25 (E.D.Pa.1987); *see also In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 508 (D.N.J.1997), *aff'd*, 148 F.3d 283 (3d Cir.1998), *cert. denied sub nom., Krell v. Prudential Ins. Co. of Am.*, 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999).

Indeed, it has been held that price fixing cases may be well-suited for class certification, in the right circumstances. *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir.1978); *Transamerican Refining Corp. v. Dravo Corp.*, 130 F.R.D. 70, 75 (S.D.Tex. 1990) ("[m]ost price-fixing cases are suitable for class action"); *Alabama v. Chevron USA*, 1980 WL 1808, *1 (M.D.Ala. Jan.11, 1980) ("widely recognized that antitrust price-fixing cases are particularly suitable for class action treatment"); *see* Sheldon R. Shapiro, *Annotation: Propriety under Rules 23(a)and 23(b) of Fed.R.Civ.P., as amended in 1966, of class action for violation of federal antitrust laws*, 6 A.L.R. Fed. 19, 24 (1971) ("a substantial majority of the cases have held that under the circumstances antitrust class actions were maintainable"). While this Court will not apply a presumption in favor of certification, it must bear in mind that the rationale of *Eisenberg* with respect to class actions as necessary to enforce the securities laws also applies here, and that the antitrust class action is an important component in the federal scheme for deterring anti-competitive behavior.

## 1. The 23(a) Requirements

 The numerosity requirement is intended to limit the class action device to those cases in which the number of parties makes traditional joinder of parties unworkable. By modern, complex litigation standards the minimum number of parties is not large; in *Eisenberg* the Court of Appeals approved a class of 90 plaintiffs. 766 F.2d at 785–86. One defendant estimates, without citation, that the class members in this case will number "over a hundred thousand," although this may be an exaggeration. Globe Brf. at 1 (arguing class certification will involve the Court in "over a hundred thousand 'mini trials'"). By this admission, and as an intuitive matter, the proposed class of all Mercedes–Benz purchasers in the tri-state area for seven and one-half years, easily satisfies the numerosity requirement.

 The Rule also requires that there be "questions of law or fact common to the class." Commonality does not require an identity of claims or facts among class members; instead, "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 184 (3d Cir.2001)(quoting *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 310 (3d Cir.1998)). In this case, common questions exists concerning the existence of the alleged conspiracy and how it worked. The involvement of each defendant dealer is relevant to each plaintiff class member, regardless of which defendant sold an automobile to that plaintiff, because each defendant was allegedly an agent of the conspiracy that victimized the plaintiff. *See DeLoach v. Philip Morris Cos.*, 206 F.R.D. 551, 558 (M.D.N.C.2002). As is generally held to be the case, here the allegation of

conspiracy in a class action context raises a central issue that will establish common questions of both law and fact. *See* 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 18.05 (3d ed.1992).[1]

Under Rule 23(a), the claims of the representative parties must be typical of the claims of the class. "The typicality requirement is said to limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Tel. Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). Typicality lies where there is a strong similarity of legal theories, or where the claims of the representative plaintiffs and the rest of the class arise from the same alleged conduct by the defendants. *In re Prudential,* 962 F.Supp. at 518. The typicality requirement ensures that the named plaintiff, in seeking to maximize her or his own recovery, will also maximize the recovery by the class.

Defendants contend that the automobile purchase transaction is too complex for any group of plaintiffs to be representative of the claims of a class. This argument merely illustrates that typicality, like commonality, overlaps with the analysis of whether common issues predominate under Rule 23(b)(3). *See DeLoach,* 206 F.R.D. at 555. But "overlap" of issues does not mean that the issues are the same. The majority of defendants' arguments based on the inherent nature of the automobile purchase transaction will be addressed *infra* in the section dealing with the predominance of common issues. Likewise an argument by defendants that the complaint is not sufficiently specific with regard to the factual basis for plaintiffs' claims has been addressed elsewhere, in the Court's opinion on the motion to dismiss.

Typicality does not require that the claims of the named plaintiffs be identical to those of the proposed class members. *In re Prudential,* 148 F.3d at 311. " '[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise

to the claims of the class members, and if it is based on the same legal theory.' " *Baby Neal v. Casey,* 43 F.3d 48, 58 (3d Cir.1994) (quoting *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 923 (3d Cir.1992)). Typicality will be lacking on the ground of intraclass conflict where the legal theories of the named plaintiffs are at odds with those of the class members. *Baby Neal,* 43 F.3d at 57–58. However, while the Court must ensure that the interests of the plaintiffs are congruent, the Court will not reject the plaintiffs' claim of typicality on speculation regarding conflicts that may arise in the future. *In re Toilet Seat Antitrust Litig.,* 1976 WL 1265, *3 (E.D.Mich., May 26, 1976).

It follows from the foregoing that the typicality requirement is satisfied in this case. The central claim for the named plaintiffs is that they were harmed by an illegal price-fixing conspiracy. This will be the same for all of the class members. The amount of damages due the named plaintiffs should their allegations prevail will not be disproportionate to that of the other class members. In short, the named plaintiffs are typical of the class. Potential differences in the individual class members' transactions will be discussed elsewhere in this opinion.

The Court will not long delay over whether the class representatives and their counsel will adequately represent the interests of the class. Plaintiffs' counsel's conduct of this case to date has led to a sophisticated and professional exposition of the issues to the Court. Counsel has cooperated with the Court's case management directives. No conflict of interest has been alleged that would impede the effectiveness of counsel in representing the class. The Court can ask no more at this stage of the litigation.

## 2. Certification under 23(b)(2)

Under Rule 23(b)(2), plaintiffs argue that injunctive or declaratory relief is appropriate on a class basis, because defendants have "acted or refused to act on grounds generally applicable to the class." Certification under 23(b)(2) is not appropriate where

---

1. It will be seen *infra* in the discussion of predominance of common issues under Rule 23(b)(3) that the existence and operation of the alleged

conspiracy is far from the only issue common to all parties in this case.

the plaintiffs' claim seeks predominantly money damages. *In re School Asbestos Litig.,* 789 F.2d 996, 1008 (3d Cir.), *cert. denied,* 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986); *Robinson v. Metro–North Commuter R.R.,* 267 F.3d 147, 163 (2d Cir.2001), *cert. denied,* 535 U.S. 951, 122 S.Ct. 1349, 152 L.Ed.2d 251 (2002); Fed.R.Civ.P. 23 advisory committee's note (1966). Conversely, courts have certified 23(b)(2) classes despite a claim for money damages where the damages were incidental or ancillary to a primary claim for an injunction. *E.g., Lloyd v. City of Philadelphia,* 121 F.R.D. 246, 251 (E.D.Pa.1988); 1 *Newberg & Conte, Newberg on Class Actions, supra,* § 4.14 at 4–47.

■ The Court does not believe that the relief sought in this matter is appropriate for certification under 23(b)(2). Plaintiffs seek compensation for a past wrong allegedly perpetrated when they bought their Mercedes–Benz automobiles. The complaint seeks an injunction against continuing the conspiracy, but there is nothing to suggest that class members will buy more automobiles from the defendants in the future. Thus any prospective harm that an injunction might prevent is speculative.

Moreover, the prayer for damages in this case is not incidental or ancillary to some more central equitable remedy sought by plaintiffs. On the contrary, this case focuses squarely on a claim for compensatory money damages. *See In re School Asbestos Litig.,* 789 F.2d at 1008. Assessing the "realities of the litigation," the Court will deny plaintiffs' motion with respect to class certification under Rule 23(b)(2). *Id.* The parties or the Court remain free to revisit the issue later in the case should circumstances evolve.

### 3. Certification under 23(b)(3)

#### a. Predominance of Common Issues

■ Rule 23(b)(3) requires two elements. Legal and factual questions common to the class must predominate over questions affecting only individual class members and the class action must be superior to other available methods of adjudicating the controversy. The Rule sets forth a non-exhaustive list of factors to be weighed:

(A) the interest of the members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

■ The issue of predominance of common issues is the most hotly contested on this motion. Predominance requires more than that common issues exist. Predominance requires that the common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members. *Cf. Amchem,* 521 U.S. at 624, 117 S.Ct. 2231 ("Given the greater number of questions peculiar to the several categories of class members, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard."). The predominance inquiry cannot be divorced from the second element of the Rule, whether class action is the superior mode for adjudication, because only where predominance exists do the economies of scale justify aggregating claims in a class action. *See* Fed. R.Civ.P. 23 advisory committee's note (1966).

■ The mere existence of individual issues will not of itself defeat class certification. *Weisfeld v. Sun Chem. Corp.,* 210 F.R.D. 136, 141 (D.N.J.2002). "The predominance requirement calls only for predominance, not exclusivity, of common questions." *Shelter Realty Corp. v. Allied Maintenance Corp.,* 75 F.R.D. 34, 37 (S.D.N.Y.1977), *appeal dismissed,* 574 F.2d 656 (2d Cir.1978). The Court must determine whether the common legal and factual issues are more significant than the non-common issues such that the class is "sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231. To prevail, a civil antitrust plaintiff must establish (1) a violation of the antitrust laws, (2) the fact of antitrust injury or "impact" on the plaintiffs,

and (3) what damages were sustained. *Danny Kresky Enters. Corp. v. Magid,* 716 F.2d 206, 209–10 (3d Cir.1983). It is with respect to these elements that common proofs and legal issues must predominate.

The antitrust violation would be established in this case by proof of the existence and scope of the alleged price-fixing conspiracy. As noted in the *Flat Glass* case, common issues predominate when the focus is on the defendants' conduct and not on the conduct of the individual class members. 191 F.R.D. at 484. The commonality amongst the plaintiffs of proof of the conspiracy and the acts taken in furtherance of it has already been cited in connection with the Court's analysis under Rule 23(a)(2). There is little room for dispute that common issues of fact and law will predominate on this element of plaintiffs' case.

The Court identified fraudulent concealment in its prior opinion as a possible issue in this case. While class members' individual actions may be relevant, this issue too depends primarily on defendants' actions. *Id.* at 487–88. In fact, the courts have typically held that common issues predominate where a proposed class has alleged fraudulent concealment. *Linerboard,* 305 F.3d at 162.

■■■ "[T]he issue of liability in an antitrust case includes not only the question of violation, but also the question of fact of injury, or impact." *Blue Bird Body Co.,* 573 F.2d at 320. Antitrust defendants resisting class certification routinely argue that the complexity of their particular industry makes it impossible for common proofs to predominate on the issue of antitrust impact. *In re Industrial Diamonds Antitrust Litig.,* 167 F.R.D. 374, 382 (S.D.N.Y.1996); *In re Glassine & Greaseproof Paper Antitrust Litig.,* 88 F.R.D. 302, 306 (E.D.Pa.1980). Evaluating this contention requires an examination

of the industry involved, *In re Industrial Diamonds,* 167 F.R.D. at 382, but the argument "is usually rejected where the conspiracy issue is the overriding one." *In re Glassine & Greaseproof Paper,* 88 F.R.D. at 306.

Here defendants argue that predominance on the issue of impact is impossible given the relationship between their cars and the luxury car market in general and because of the nature of the automobile purchase transaction. Defendants contend that, if the relevant market were properly defined to include all luxury cars, Mercedes–Benz dealers would lack sufficient market power to affect prices in that market, and thus antitrust impact would be impossible. Defendants dispute the testimony of plaintiffs' expert Dr. Beyer that Mercedes–Benz automobiles are differentiated products from other luxury cars, and they contend that market power of the Mercedes–Benz dealers must be evaluated over all luxury car sales.

According to defendants, the idiosyncracies of each transaction also preclude the possibility that common issues will predominate on the element of impact. The purchase prices of some, probably most, cars is negotiated individually between the customer with the dealer. Each customer will vary in her or his ability to get a good price. Some will not negotiate at all, but act simply as a "price taker" paying either the manufacturer's suggested retail price ("MSRP") or whatever other price the dealer demands.[2] Added variables are financing terms, trade-in values for the customer's old car, a myriad of optional features with which the car may be equipped, and varying levels of supply and demand between the different models.

The import of this line of argument is that the Court will have to sort out the attributes of each individual transaction, including each claimant's negotiating skill, financing, options

---

**2.** The price taker who agrees to pay MSRP poses an interesting question. A price taker who accepts without demur a price set by the dealer, whether above or below MSRP, would be harmed by the conspiracy on the theory that the dealer was naming a price inflated by the conspiracy. An MSRP price taker, however, would be paying a price set by the manufacturer, and this price might be the same nationwide and not just in the region affected by the conspiracy. Of course, this situation rests on two assumptions. First, that there are an appreciable number of true MSRP price takers, distinguished from merely failed negotiators, in the proposed class. Second, that the MSRP is in fact nationally uniform and not tailored to the region in which the car will be sold. The Court has no information on either of these points, and, therefore, must leave this issue for another day.

and the like to determine whether any given class member suffered antitrust impact. Not only would this vitiate any claim of commonality of issues, it is claimed, but, looking ahead to the question of class manageability, it would embroil the Court in uncounted mini-trials with respect to impact and the amount of damage suffered.

Plaintiffs contend that defendants' lack-of-market power argument is merely an attempt to reintroduce an issue defendants lost when the Court ruled that the alleged conspiracy was a *per se* violation of the antitrust laws for which no showing of market power was required. *In re Mercedes–Benz Anti–Trust Litig.*, 157 F.Supp.2d at 359 (horizontal price-fixing case considered *per se* antitrust violation in which "[a]nti-competitive effect within the relevant market is 'conclusively presumed'") (quoting *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir. 1998)). It is basic, however, that the *per se* nature of an alleged antitrust violation says nothing about whether antitrust impact occurred, and plaintiffs must establish that they suffered an impact even though their horizontal price-fixing allegation is the archetype of prohibited anti-competitive activity. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

The Court will concede for the sake of argument that some cases involving an alleged *per se* antitrust violation might still require a showing of market power to establish the antitrust impact element. The Court will leave for academic discussion the tension between the two principles. The Court doubts that this is such a case, however.

The Third Circuit recently revisited this area in *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir.2002), reaffirming its older opinion in *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). *Bogosian* created the so-called "*Bogosian* short-cut" to deal with the question of impact when there are multiple variables affecting the price paid by the plaintiff. The panel wrote:

If, in this case, a nationwide conspiracy is proven, the result of which was to increase prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime, an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price. If the price structure in the industry is such that nationwide the conspiratorially affected prices at the wholesale level fluctuated within a range which, though different in different regions, was higher in all regions than the range which would have existed in all regions under competitive conditions, it would be clear that all members of the class suffered some damage, notwithstanding that there would be variations among all dealers as to the extent of their damage.... Under these circumstances proof on a common basis would be appropriate.

561 F.2d at 455. *Linerboard* concerned allegations of manipulation by the defendants of the supply of corrugated paper by conspiring to cut production. The Court of Appeals held that evidence of the manipulation of supply together with the law of supply and demand would establish that the class members paid artificially high prices and thus constitute common evidence of antitrust impact to the plaintiff class under the *Bogosian* short-cut.

This portion of the *Bogosian* opinion can be read either of two ways. It can, as the language of the *Linerboard* opinion implies, simply establish a "concept of presumed impact." 305 F.3d at 152. At least one Court has read *Linerboard* and *Bogosian* to create a presumption of impact in any *per se* case, *e.g.*, *Weisfeld*, 210 F.R.D. at 142, although this is arguably inconsistent with the rule of *Atlantic Richfield* that impact must be proven separately even in a *per se* case. 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333.

Alternatively, the "*Bogosian* short-cut" may be applied in the spirit of that case's admonition that common proof of damage must "depend on the circumstances of the case." There, as the Court of Appeals observed in the passage quoted above, the allegations involved a "nationwide conspiracy." Likewise, in *Linerboard*, the manufacturers' conspiracy to reduce supply apparently

raised the price for conspirators and non-conspirators alike nearly two-fold. 305 F.3d at 152–53. But the finding of antitrust impact in these cases did not depend upon the defendants' supposed market power to influence prices in some theoretically determined "relevant market." *Bogosian* and *Linerboard* merely held that the logic of the circumstances, which included a causal link between the defendants' activity and the entire universe of purchasers, dictated that every member of the class paid the inflated price.

So it is here. That defendants conspired and raised their prices is the predicate antitrust activity, and must be assumed before the Court can even consider the question of impact. Every member of the proposed class bought a Mercedes–Benz from the alleged conspirators. That a prospective customer could have bought a Lexis automobile or a Mercedes–Benz from a non-participating Internet dealer does not matter. They did not—they bought a Mercedes–Benz from one of the defendants.

It therefore does not matter for the impact inquiry whether the defendants had sufficient market power to influence the prices of all luxury cars. The conspiracy influenced in an anti-competitive way the price of the automobiles in the limited universe of the Mercedes–Benz New York region. All of the class members are within that universe. As in *Linerboard* and *Bogosian,* the logic of the circumstances leads to no other conclusion but that the anti-competitive activity had an impact on all of the class members.

The Court pauses to note its disagreement with cases cited by defendants, such as *In re Electric Weld Steel Tubing Antitrust Litig.,* 1980 WL 1992 (E.D.Pa., Nov.7, 1980). There the court found that proof of market control is required to show antitrust impact because, without such control, customers would have gone elsewhere if the conspirators had attempted to raise prices. *Id.* at *5. The argument is wholly circular. If the conspirators had not been able to raise prices, there would have been no antitrust activity in the first place. In a case of *per se* violation, it must be shown that the defendants did conspire and did raise prices, whether they had market power or not. Then one reaches the question of antitrust impact. If the substantive violation is proved and it is shown that all class members purchased from a price-inflating conspirator, the causal chain is complete regardless of what may have been occurring in the larger marketplace.

Plaintiffs, however, eschew reliance on any short-cuts or presumptions of impact, and claim that the opinions of Dr. Beyer establish that common proofs will be available for the fact of injury. Dr. Beyer has opined that defendants were homogeneous, selling mass-produced luxury automobiles and providing essentially inter-changeable services. Beyer Rpt. ¶ 15. Because of the lack of inter-dealer differentiation, in the absence of a conspiracy customers would avoid the dealer that attempted to raise its prices in favor of a lower priced Mercedes–Benz dealer. The conspiracy permitted all of the dealers to raise prices by eliminating the risk that customers would be able to avoid the non-competitive price, thus working an antitrust injury on the entire class. Beyer Rpt. ¶¶ 9, 26. Thus, prices were raised for all New York-region Mercedes–Benz customers. Variations in the negotiating skill of the purchaser would not eliminate the injury; the hard bargainer might have gained a good price, but would have done better yet in the absence of the conspiracy. Beyer Rpt. ¶ 30.

Dr. Beyer tracked both prices and dealer gross profits and opines that both figures remain within a small range for the seven dealers he sampled. He explains that this fact means that inter-dealer coordination of pricing would therefore affect all Mercedes–Benz purchasers within the class period. From this, Dr. Beyer claims that using either a benchmark formula or multiple regression analysis could establish a reliable, class-wide measure of damages, and that other variables such as the cost of different equipment options and model differences could be controlled for. Beyer Rpt. ¶ 25, 32–41. It is worth noting that Dr. Beyer is the same expert who appeared in the *Linerboard* case, and that the Court of Appeals approved of his use of both the benchmark and multiple regression methods of analysis. 305 F.3d at 153–54. As for a source of a competitive benchmark price, he suggests that either

Mercedes–Benz prices from before the inception of the conspiracy or prices from another, untainted, metropolitan region might provide the "but-for" benchmark of Mercedes–Benz prices absent the conspiracy.

Defendants' arguments miss the mark in part because they are directed to supposed difficulties in quantifying the amount of the claimants' individual damages, as opposed to the core issue of the fact of antitrust injury. There is ample authority that the need for individualized damages calculations should not automatically preclude class certification. *In re Industrial Diamonds Antitrust Litigation*, 167 F.R.D. 374, 382 (S.D.N.Y.1996); *see, e.g., Bogosian*, 561 F.2d at 456 ("commonly recognized" that individual calculation of damages will not prevent class certification); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 697 (D.Minn.1995); *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1043–44 (N.D.Miss.1993).

Of course, this presupposes that common issues predominate on liability. *Bogosian*, 561 F.2d at 456. The rule proceeds from the premise that the wrongdoer should not be permitted to claim that it operates in a field so complex that the standard of proof is therefore unattainable. *In re Catfish*, 826 F.Supp. at 1042–43. Here defendants' argument would apply to any automobile dealer. The Court is reluctant to adopt a rule that would immunize an entire industry from antitrust class actions.

 Defendants use much of their briefs to mount an attack on the merits of plaintiffs' expert's opinion. They repeat this attack in what is styled a motion to strike the testimony of Dr. Beyer under Federal Rule of Evidence 702. Some of their criticisms have more substantive bite than others, which simply amount to a disagreement with Dr. Beyer's conclusions. The fundamental flaw in the defendants' approach, however, is to misapprehend the precise issue to be decided on this motion, and thus to mis-characterize plaintiffs' burden. " 'In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.' " *Eisen v. Carlisle and Jacque-*

*lin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (quoting *Miller v. Mackey Int'l, Inc.*, 452 F.2d 424, 427 (5th Cir. 1971)).

 The Court is not to conduct a preliminary inquiry into the merits of plaintiffs case. *Id.* Consequently, Dr. Beyer need not establish now that there is class-wide antitrust impact. *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 307 (E.D.Mich.2001). Nor need he establish that plaintiffs now have, in hand, all of the common evidence necessary to establish class-wide impact. Such a requirement would convert a class certification motion under Rule 23 into a summary judgment motion under Rule 56. As this Court perceives plaintiffs' burden under Rule 23(b)(3), they must adduce sufficient evidence and a plausible theory to convince the Court that class-wide impact (among the other elements of their claim) may be proven by evidence common to all class members. *See DeLoach*, 206 F.R.D. at 560 (court not to weigh truth of evidence but determine whether it is "suitable for class-wide use") (internal quotation omitted); *Flat Glass*, 191 F.R.D. at 487 (issue on class certification is whether plaintiffs have "identified a valid method for determining damages").

That is not to say that the Court would grant class certification on fanciful or improbable suppositions on what the common evidence might be. That is clearly not the situation before the Court, however. On fungibility, Dr. Beyer opined in effect that a Mercedes–Benz automobile sold by one dealer is very like a Mercedes–Benz automobile sold by another, such that antitrust impact would be felt by all who purchased from the alleged conspirators as a class. This intuitively obvious proposition is bolstered by the fact that the automobiles are advertised on a national basis without any reference to a particular dealer. Plaintiffs point out that Dr. Beyer's opinion that the dealers are homogenous is supported by the fact that each has contractual obligations to provide the same services. This Court is not the first to recognize that common proof of impact is possible in the automobile market "notorious for haggling and negotiations in purchasing." *Rosack v. Volvo of Am. Corp.*, 131 Cal.App.3d

741, 182 Cal.Rptr. 800, 811 (1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 482 (1983); *see also id.* ("The good negotiator in the fixed market would presumably have gotten an even better 'deal' in a competitive market.").

Defendants' objection that Dr. Beyer's report did not delve into such issues as cross-elasticity of demand, supplier perception and consumer preference in determining product fungibility does not undermine the value of Dr. Beyer's opinion at this procedural stage of the case. If plaintiffs feel it necessary, they will no doubt present theories under these headings at trial, and defendants will remain free to attack them on those grounds. Defendants also argue that dealers are not homogeneous, because they have different reputations and customer goodwill based upon such intangibles as friendliness and convenience to the customer's residence. Opp. Brf. at 18. Again, this point attempts to substantively counter the ultimate merits of the plaintiffs' case, it does not rebut plaintiffs' showing at this point in the litigation that the common evidence they intend to adduce *may* show antitrust impact on a class-wide basis.

Defendants also complain that Dr. Beyer reviewed the details of far too few transactions to provide a statistically reliable basis for his conclusions. The Court is aware that there has been controversy over production of the so-called "deal jackets." These are files in which are preserved the records of each automobile purchase, files which were maintained or supposed to have been maintained by the individual dealers. The production of these deal jackets has been the subject of rulings by the Special Master appointed by this Court. Defendants have requested permission to file a surreply directed to a disputed interpretation of the history of the deal jacket controversy.

The Court will not entertain the proposed surreply nor take a stand on the issue ruled upon by the Special Master. For the purposes of this motion, the Court finds that plaintiffs and Dr. Beyer have sustained their burden. Dr. Beyer represents that he and his staff reviewed "over a thousand" of the deal jackets. Beyer Rpt. ¶ 24. This may

have been a small, even a statistically meaningless cross-section of the total universe of documents, as defendants suggest. From the small number of deal jackets Dr. Beyer reviewed, he may not have been able to reliably opine on the average class-member's transaction. But that was not his task. He has established a method by which he or another expert might be able to derive an analytical model to determine the existence of class-wide impact. That is all that is required.

### b. Superiority of class-action adjudication

■ The Court is satisfied that a class action is the superior method of adjudication for the class members' claims. The factors listed in the Rule either favor certification or do not decisively disfavor it. Acknowledging the inter-relation of these factors and the considerations already discussed and taking into account other issues not listed in the Rule, the Court finds that this last requirement of Rule 23 is fulfilled.

In determining whether a class-action is a superior method of adjudication, Rule 23 first instructs the Court to consider the potential interest of class members in individually prosecuting their claims. The high price of Mercedes–Benz automobiles notwithstanding, the evidence supports a preliminary presumption that an alleged illegal overcharge will range from a few hundred to a few thousand dollars at most. The Court finds that the relatively small amount at stake for each claimant vitiates any argument that each has an interest in controlling the prosecution of the case. *Crawford v. Equifax Payment Servs., Inc.,* 201 F.3d 877, 880 (7th Cir.2000) (In "small-stakes cases, a class suit is the best, and perhaps the only, way to proceed."). Indeed, the size of each claimant's alleged loss is undoubtedly too small to be economically litigated at all outside of a class action. *See In re General Motors Corp. Pick–Up Truck Fuel Tank Prods. Liability Litig.,* 55 F.3d 768, 809 (3d Cir.) (discussing desirability of protecting uneconomically small claims), *cert. denied,* 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995).

As to factor (B), the Court is aware of only one other litigation in the New York area in which antitrust allegations have been raised against Mercedes–Benz, *Mercedes–Benz USA, Inc. v. Coast Automotive Gp.*, Civ. No. 99–3121 (D.N.J.), and that matter is already pending in this Court. Under factor (C), the Court perceives no disadvantage inherent in concentrating the claims in this forum. The distances the parties must travel are not great. The governing law is federal and thus no state conflicts of law are presented.

Defendants warn that the difficulty of managing the litigation, the last of the Rule 23(b)(3) factors, will prove the undoing of this class action. They emphasize the size of the proposed class and posit the need for a jury determination to calculate each claimant's damages. The discussion thus far will have alerted the reader to the fact that, while common issues may predominate, individual ones exist as well, particularly with respect to damages.

The courts have learned much since *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir.1977), denying class certification on, *inter alia*, manageability grounds. It was noted that the class would number 20,000 and notice would cost $30,000. *Id.* at 66. In light of recent complex litigation matters in this District with which counsel will be familiar, these figures are modest. The potential in this action of 100,000 to 150,000 claimants hardly makes it extraordinary in modern class action litigation on numbers alone.

It may be that individual damages calculations may be more complex than for cases in which the underlying transaction has fewer variables. If so, there are a number of devices that may be used to avoid the threat of "over a hundred thousand 'mini trials' " surmised by defendants. Variables such as optional equipment packages and financing incentives may be accounted for by damages formulae which allow for these factors to determine the anti-competitive overcharge for the particular claimant. The Special Master may be pressed into service, with a final damage report to be confirmed by a jury. Another avenue may be available if this case is amenable to proof of an aggregate judgment of liability, which, it might be argued, would leave allocation between class members as an internal class issue to which defendants would have no right to insist on a jury. *See generally* 1 *Newberg & Conte, Newberg on Class Actions, supra*, § 4.26 at 4–99. Without committing now to any one solution, it is apparent that many exist that may prove both efficient and protective of defendants' jury rights.

Conversely, the Court will remain sensitive to the possibility that, once liability is decided, manageability issues may require some different treatment. This may involve amending the class, establishing sub-classes, or even de-certification for damages purposes. *See Bogosian*, 561 F.2d at 456. Common liability issues clearly predominate. A class action is likely the only way in which these liability issues will ever be litigated. Rather than refuse certification on the doubtful ground that damages calculations will overwhelm the Court, "that risk is better addressed down the road, if necessary." *In re Bally Mfg. Secs. Corp. Litig.*, 141 F.R.D. 262, 268 (N.D.Ill.1992).

The Court notes finally an interest not explicitly enumerated in the Rule. There is a public interest consideration that must underlie the Court's decision. It is apparent that were this motion to fail, the case would be over. The Court will not strain to provide a remedy where none exists in the positive law of the statute and the rules of procedure binding on the Court. However, the Court will examine with care an argument by an alleged wrongdoer that the complexity of the very wrong alleged places it beyond the reach of the law. Here plaintiffs have carried their burden and convinced the Court that this is not so and that this case should proceed.

### CONCLUSION

For the reasons set forth above, the Court will grant the motion for class certification under Federal Rule of Civil Procedure 23(b)(3). The motion to grant class certification under Rule 23(b)(2) will be denied. Defendants' motion to strike the report of Dr. Beyer will be denied without prejudice to their ability to renew this motion with re-

spect to testimony anticipated from him on issues other than class certification.